**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

JOHN C. YARIAN,

Plaintiff,

01-1144 (MJD/JGL)
**MEMORANDUM OPINION & ORDER**

v.

RAINBOW FOODS GROUP,

Defendant.

---

Eric O. Haugen, Haugen Law Firm, PLLP, for and on behalf of Plaintiff.

Timothy J. Nolan and Piper Kenney Webb, Rider Bennett Egan & Arundel, LLP, for and on behalf of Defendant.

---

The plaintiff, John C. Yarian ("Yarian"), commenced this action in federal district court alleging that the defendant, Rainbow Foods ("Rainbow") misappropriated his trade secret. Rainbow counterclaimed against Yarian under Minn. Stat. § 43A.38 pursuant to Minnesota's Private Attorney General Statute, Minn. Stat. § 8.31. Rainbow's motion for summary judgment on the misappropriation claim and Yarian's motion for summary judgment on the counterclaim are now before the Court. For the reasons set forth below, the Defendant's motion for summary judgment is DENIED and Plaintiff's motion for summary judgment is GRANTED.

FILED 3-18-03
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## FACTUAL BACKGROUND

Yarian is a former investigator with the Department of Weights and Measures for the State of Minnesota. He worked for the State in this capacity from July 1, 1999 to April 10, 2001. (Yarian Decl. ¶2). While working for the State, he approached Rainbow Foods with a proposed business arrangement whereby he would verify the accuracy of Rainbow's cash register scales. (Yarian Dep. at 56). Yarian discussed with Rainbow's management the problems grocery stores have with inaccurate scales and produced a set of documents explaining the losses that Rainbow was experiencing due to inaccurate scales. (Yarian Decl. ¶22; Haugen Decl. Ex. A). On June 26, 2000, Rainbow's Director of Loss Prevention, John Webster ("Webster") signed a non-disclosure agreement which would prevent Rainbow from disclosing Yarian's method for testing the accuracy of scales. (Webb Aff. Ex. 2). In June of 2000, following the signing of the non-disclosure agreement, Yarian demonstrated his method to Webster. (Yarian Dep. at 117).

Yarian's method for testing scales is called a "four corners" test and is oriented toward the thirty-pound capacity scales used for checkout at grocery stores (Yarian Decl. ¶16). The method consists of multiple steps. First, the tester ensures that the visual display on the scale reads "zero." If it does not, the tester should press the "zero button." (Id. ¶16(a)). Then, the tester places a 10 pound weight on each corner of the scale, one corner at a time. (Id. ¶16(b)). The order is irrelevant. (Yarian Dep. at 128). If the scale reads "10 pounds" in all four of the

corners, the scale passes and is considered in good order. (Yarian Decl. ¶16(b)). A scale is also in good order, "if the sum of the errors stated through the four-corner test falls within a range of 0.00 pounds and +0.02 pounds." (Id. ¶16(c)). A minus error may also occur, for example where a scale reads 9.8 pounds at one corner. (Id. ¶16(c)). Where there is a minus error, the tester must do the following. First, check that the scale is level by checking the level ball attached as a part of the scale itself to ensure it is level. Or, where the scale does not include a level ball, the tester may place a level on the scale to ensure that the scale is level. (Id. ¶16(c)(i)). If the scale is not level, the tester should readjust the legs of the scale until it is level. The scale is then retested by again placing the weight on each of the four corners. (Id. ¶16(c)(ii)). If, after the scale is level, it still does not register correctly, the tester checks to determine whether the scale is clean by removing the scale tray and inspecting the area underneath. Any debris found is removed and the tester again employs the four corners test. (Id. ¶16(c)(iii)). Finally, if errors still result, the tester checks for "binds" caused by, "the tray or other working parts rubbing against an obstacle which causes the error to occur." (Id. ¶16(c)(iv)). The tester tests the binding, "by taking a thin object, such as a piece of paper, and running it all the way around the edge of the tray." (Id.) The tester tries to resolve the binding problem and then repeats the four corners test. (Id.). If the scale is still inaccurate, Yarian recommends that the owner contact a scale professional. (Id. ¶16(c)(v)).

Following the demonstration, Rainbow and Yarian negotiated an agreement. After several interactions, Rainbow signed a License Agreement (Haugen Decl. Ex. C). The record indicates that Yarian never signed the agreement. (Id.).

Shortly after the License Agreement was signed, Webster contacted Yarian and informed him that Rainbow would not pursue its business relationship with him. Rainbow states that it decided to use its own employees to calibrate and verify the accuracy of its cash register scale equipment instead of entering into an agreement with Yarian. (Webster Dep. at 29). Rainbow then sent four employees to the State to obtain certification to test and calibrate its scales. (Meduna Dep. at 35-37). After the certification, Troy Meduna ("Meduna") and Webster met with Troy Larson ("Larson"), a scale repair person, who gave them additional training. (Id. at 40).

In November 2000, Yarian went to the Inver Grove Heights Rainbow store as part of his employment with the State. Yarian claims that a Rainbow employee, Ryan Hauschildt ("Hauschildt"), approached him while he was doing paperwork in his van. (Yarian Decl., ¶32). During a conversation regarding problems with the scales at another Rainbow location, Hauschildt told Yarian that when he tests scales he places a 10 pound weight on each of the four corners of a 30 pound capacity scale, uses the readings to determine if the scale needs cleaning, and retests the scale after cleaning in order to determine if the scale is accurate. (Yarian Decl. ¶33). These facts are disputed by the record. Rainbow notes that the

facts as Yarian presents them in his declaration are contrary to his earlier deposition testimony in which he states that Hauschildt told him that in testing the scales they "place a weight on each of the four corners *and the center* of the device..." (Yarian Dep. at 159)(emphasis added). Yarian further claims that during their conversation, Hauschildt used unpredictable language that he had used when demonstrating his technique to Rainbow, in particular, the term "minus one" rather than "one division" as commonly used in the industry. (Id.)

Yarian then proceeded to test some of the scales at the Inver Grove Heights store. Yarian states that while inspecting the scales, he found that one of them was not weighing accurately. (Yarian Dep. at 156). He told Hauschildt about the problem. (Id. at 157). Hauschildt then had another employee, Meduna, calibrate the scale. Yarian contends that prior to calibrating the scale, Meduna tested the scale by placing a ten-pound weight at each of the four corners of the scale. (Id. at 159-161).

**DISCUSSION**

**Summary Judgment Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enterprise Bank v. Magna Bank of Missouri, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine

issue of material fact and that it is entitled to judgment as a matter of law. Id. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**Trade Secret**

Yarian asserts that Rainbow misappropriated his trade secret. Rainbow argues that Yarian's method does not constitute a "trade secret" per Minn. Stat. § 325C.01. Without a proven trade secret, there can be no action for misappropriation, even if defendant's actions were wrongful. Jostens, Inc. v. National Computer Systems, 318 N.W.2d 691, 701 (Minn. 1982).

Minn. Stat. §325C.01, subd. 5 (2001) defines "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that
> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use, and
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id.

In Minnesota, in order for information to constitute a trade secret, a party must prove: (1.) the information is not generally known or readily ascertainable, (2.)

the information derives independent economic value from its secrecy; and (3.) the party asserting misappropriation must have made reasonable efforts to maintain the information's secrecy. Lexis Nexis v. Beer, 41 F.Supp.2d 950, 958. (D. Minn. 1999); see Nordale, Inc. v. Samsco, Inc., 830 F.Supp. 1263, 1273 (D.Minn. 1993); Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 899-901 (Minn. 1983). Under this test, the plaintiff has the burden of proving all three factors in order to establish that a trade secret exists. See Electro-Craft Corp., 332 N.W.2d at 899.

Here, it is undisputed that Yarian has satisfied the third prong of the three prong test. The record indicates that Yarian and Rainbow entered a confidentiality agreement regarding Yarian's method upon Yarian's insistence. The Defendants offer no evidence regarding this prong. Having found that Yarian employed reasonable efforts to maintain the information's secrecy, this Court will now consider the remaining two prongs.

**1. Not generally known and or readily ascertainable**

Rainbow contends that Yarian's method is not unique and that each step is generally known or readily ascertainable. Rainbow submits that mere variations in general processes generally known in the field, which embody no superior advances are not protected. Jostens, Inc., 318 N.W.2d at 698.

As evidence that Yarian's method is generally known, Rainbow notes that when employees Webster and Meduna met with Troy Larson, an employee with ICL, a company that manufactures and repairs scales, he also showed them a test

that included placing a weight in the four corners of the scale. (Meduna Dep. at 40, Webster Dep. at 98-99). Larson confirmed that he did this. (Webb Aff. Ex. 5). Further, Larson explained that he always checks whether the scale is clean and he checks the binding as well. Id. Rainbow also asserts that Yarian's deposition testimony admits that manufacturers recognize interference with the tray as an issue in servicing the scales. (Yarian Dep. at 141-142). Further, Mark Buccelli, Yarian's former supervisor with the State, testified that he was familiar with placing the weight in the four corners; that the method is generally known in the field, and that it is not uncommon to check the scale's binding or to check for cleanliness. (Buccelli Dep. at 51, 70-71, 73).

Rainbow further contends that Yarian's method is a mere variation on the "shift test" as set forth in the NIST handbook. (Id. at 50). The shift test instructs one to use a half capacity weight (e.g. 15 pounds for Rainbow's 30 pound scales) and place it in the "four points equidistant between the center and the front, left, back and right edges of the load receiving element" instead of the four corners. Rainbow states that its employees learned this technique from someone other than Yarian.

Rainbow next argues that Yarian's method is not sufficiently novel to constitute a trade secret and that a combination of generally known techniques does not constitute a trade secret. Novelty is not a requirement for trade secrets to the same extent as for patentability, however, mere variations on widely used processes cannot be trade secrets. Electro-Craft Corp., 332 N.W.2d at 899.

Rainbow argues that the only thing 'novel' about Yarian's method is the use of the 10-pound weight but notes that Yarian's patent application admits that one can use a test weight of ¼ to ½ capacity, or 7.5 or 15 pounds capacity. Buccelli from the Department of Weights and Measures testified that, in his opinion, there is no difference between using a ten-pound or a five pound weight in doing the test. (Buccelli Dep. at 73-74).

As proof that his method is not generally known or readily ascertainable, Yarian offers his multiple discovery requests for documents relating to his method, which Rainbow did not supply. Among the requests was to, "[p]roduce all documents relating to the use of less than one-half capacity weight or weights in connection with the testing of grocery store scales for accuracy, including such documents forming a part of either maintenance or calibration methods and all documents relating to the use of less than one half capacity weight or weights in connection with the testing of grocery scales." Another discovery request was to "[s]et forth in detail each and every step undertaken in connection with every separate procedure presently utilized by Rainbow in connection with maintenance work undertaken in connection with any of its scales." (Haugen Decl. Ex. D).

Yarian also offers the deposition testimony of Juan Peralta ("Peralta"), a Rainbow employee who attended the scale training. Peralta signed a statement saying that he attended a class by the Department of Public Service on or around October 11, 2000. The signed statement says that he learned the "four-corners technique" as a part of his class. (Haugen Decl. Ex. F). However, Peralta's

deposition testimony indicates that the first time he heard of the "four-corners technique" was when he was asked to sign the statement. (Peralta Dep. at 60).

In response to Rainbow's argument that his method is not sufficiently novel to constitute a trade secret, Yarian states that the 10-pound weight is an integral part of his method because the scales being tested are 30 pound capacity scales. He further claims that Rainbow neglects the significance of the "combination" of steps in forming his trade secret. (Pl.'s Mem. in Response to Summ. J. at 20). Yarian's Declaration indicates that his technology is not limited to utilization of a 10 pound weight, "but in the case of 30 pound capability bench or counter scales, such as those used at Rainbow, utilization of a 10 pound weight is preferred. Another key to my technology are [sic] the corrective measures entailed in conjunction with and simultaneously with use of my four-corners technique and utilizing the sum of the errors." (Yarian Decl. ¶19).

**2. Derive independent economic value from secrecy**

In order to determine whether a claimed trade secret derives economic value from its secrecy, the courts look to whether the "trade secret" provides the holder with a competitive advantage. "If an outsider would obtain a valuable share of the market by gaining certain information, then that information may be a trade secret if it is not known or readily ascertainable." <u>Electro-Craft Corp.</u>, 332 N.W.2d at 900; <u>see</u> <u>Cherne Indus., Inc. v. Grounds & Assocs., Inc.</u>, 278 N.W.2d 81, 90 (Minn. 1979). Rainbow contends that

Yarian had no competitive advantage in the market, and that he had never generated any profit from his method, having never sold the method to anyone. Rainbow further argues that the method is useless to Rainbow because the test determines that the scale is broken but does not repair it. The store still needs to pay for the repair.

Yarian responds that the procedure would have been economically valuable to Rainbow. Yarian notes that at the time Rainbow signed a License Agreement it valued Yarian's method at over $90,000. Further, Yarian cites a letter from Webster to Yarian in October of 2000: "Again, it was very disappointing to me that we could not come to terms; I truly believe your systems would have been very successful in saving us money." (Haugen Decl. Ex. 1). Yarian also cites Webster's deposition testimony, which indicates that Rainbow was motivated to enter the contract by the expectation that Yarian's services would save Rainbow money. (Webster Dep. at 58-59).

The Court finds that it is best to leave the issue of whether Yarian's method is generally known or readily ascertainable to the trier of fact. See Northwest Airlines v. American Airlines, 853 F. Supp. 1110, 1114 (D. Minn. 1994)(citing Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 900 n.11 (Minn. 1983)). In some situations, a novel or unique

combination of elements may constitute a trade secret while mere variations on widely used information cannot be trade secrets. Strategic Directions Group, Inc. v. Bristol-Myers Squibb Co., 293 F.3d 1062, 1065 (8th Cir. 2002). While Yarian's method appears similar to other scale accuracy tests, it is significant that Rainbow contemplated and even signed a contract to pay Yarian $90,000 a year for the use of this method. Further, the record indicates that Rainbow has been unable to supply discovery documents referencing even the particular elements of Yarian's method. Given the License Agreement for $90,000 and the absence of material or information available regarding Yarian's method, the Court concludes that Yarian has proffered sufficient evidence to create a genuine issue of material fact for a jury to consider.

Second, the record suggests that an independent economic benefit may be derived from the method's secrecy and may provide a party with a competitive advantage. The record provides evidence indicating that Rainbow saw fit to enter into a $90,000 a year contract for the use of Yarian's method. This alone suggests that a reasonable jury could conclude that Yarian's method could "derive independent economic value. . . from not being generally known. . . and not being readily ascertainable. . ." Minn. Stat. § 325C.01, subd. 5(i). These facts, viewed in the light most favorable

to the nonmoving party, create a genuine issue of material fact as to whether Yarian's method is a trade secret.

**Misappropriation Claim**

Rainbow argues that even if Yarian's method does constitute a trade secret, Rainbow was not using that method and, therefore, did not misappropriate it. Rainbow asserts that the Rainbow employees whom Yarian encountered learned the method from the State and from Larson. Rainbow also states that Haushildt described placing a weight in the center of the scale, which the Yarian method does not proscribe. Further, Meduna did not test the bindings or for cleanliness. Rainbow also points to Meduna's testimony that he used a 10 pound weight because it was the biggest in his weight set.

Yarian contests Rainbow's statement that, "Yarian disclosed his proprietary information to John Webster. It is undisputed that Webster never disclosed it to anyone." (Def.'s Mem. Supp. Summ. J. at 11). Yarian cites the deposition testimony of loss prevention employee, Michael Snicker ("Snicker"), who states that he learned the four point test from Webster and Meduna, and explains that they had "apparently met with someone from either ICL or NCR, one of our scale companies. And that person taught them a way—the way you can recalibrate the scales and determine if they

are in balance and things. And then they passed that along to me.... They're the ones who taught me how to do that, yeah." (Snicker Dep. at 17).

Yarian also cites Meduna's ambiguous deposition testimony stating that Webster had informed him that "Mr. Yarian had tried to sell his services to Rainbow to do the- - - what they chose to have us do." (Meduna Dep. at 112). Further, Yarian cites a signed statement by Snicker regarding his training by the Minnesota Department of Public Service Weights and Measures. The statement indicates that Snicker knew and used the four corners method: "[a]t the training the instructors discussed numerous ways of testing scales to determine if they are accurate. One way of testing discussed was the four-corner method, which we currently are using to determine if a scale needs to be recalibrated." (Haugen Decl. Ex. N).

Yarian also claims that Rainbow's argument that their method for testing scales was derived from the ICL is false because the ICL representative never recommended or showed the use of a 10 pound weight.

Finally, Yarian points to a signed statement by Meduna stating that the method he used is identical to that described in Handbook 44 which calls for the use of a half capacity weight. (Haugen Decl. Ex. O). However, during his deposition, Meduna testified that he used a 10 pound weight, not a half-pound weight as described in the handbook. (Meduna Dep. at 109-110).

Given the conflicting testimony regarding which method Rainbow's employees used and who taught them the method, the Court finds that should a jury conclude that Yarian's method is a trade secret, a question of fact would also exist as to the misappropriation claim[1].

**Damages**

Rainbow argues that Yarian has not indicated that he has incurred any damages as a result of Rainbow's alleged wrongful conduct, nor has he presented evidence that Rainbow reaped a financial benefit from the alleged use. Rainbow also notes that after Yarian complained to Rainbow, Webster instructed his employees to place the weights on the north, south, east and west positions of the scale rather than the four corners. Rainbow asserts that this indicates that Rainbow used the method for one month at most, with no proof that Rainbow reaped a benefit from using the method.

Yarian correctly states that if Rainbow is found to have misappropriated his trade secret, he would be due damages consistent with Minn. Stat. §352C.03 regarding damages for prevailing plaintiffs in trade secret litigations:

[1] In his Memorandum in Opposition to Defendant's Motion for Summary Judgment, Yarian argues that Rainbow misappropriated his trade secret again when defense counsel revealed his method to Larson, a Rainbow expert witness. The Court will not consider this claim as the record indicates that a protective order is now in place permitting the parties' experts to review the information designated as confidential and for counsel only.

> Damages can include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Id.

Should Yarian prevail at trial, Minn. Stat. § 352C.03 would apply to the determination of his damages.

**Rainbow's Counterclaim**

Defendant Rainbow Foods asserts a counterclaim against Yarian alleging that Yarian violated Minn. Stat. § 43A.38, subd. 5 regarding code of ethics for employees in the executive branch. Rainbow asserts that Yarian violated the statute by approaching Rainbow about entering into a business arrangement based on his knowledge and expertise as an investigator and for conducting a private investigation of the Rainbow store while acting in his enforcement capacity as an employee of the State. (Def.'s Countercl. ¶¶ 1-3).

Minn. Stat. § 43A.38, subd. 5 states as follows:

> **Subd. 5. Conflicts of interest**. The following actions by an employee in the executive branch shall be deemed a conflict of interest and subject to procedures regarding resolution of the conflicts, section 43A.39 or disciplinary action as appropriate:
> (a) use or attempted use of the employee's official position to secure benefits, privileges, exemptions or advantages for the

> employee or the employee's immediate family or an organization with which the employee is associated which are different from those available to the general public;
> (b) acceptance of other employment or contractual relationship that will affect the employee's independence of judgment in the exercise of official duties;
> (c) actions as an agent or attorney in any action or matter pending before the employing agency except in the proper discharge of official duties or on the employee's behalf; or
> (d) the solicitation of a financial agreement for the employee or entity other than the state when the state is currently engaged in the provision of the services which are the subject of the agreement or where the state has expressed an intention to engage in competition for the provision of the services; unless the affected state agency waives this clause.

Id.

Because § 43A.38 does not contemplate a private cause of action, Rainbow brings this claim pursuant to the Minnesota's Private Attorney General Statute, Minn. Stat. § 8.31. (See Def.'s Countercl. ¶¶ 1-3). Minn. Stat. § 8.31 allows the Attorney General to investigate offenses against the provisions of certain designated statutes. Section § 43A.38 is not included in the list of statutes, although the list is not exclusive. See Minn. Stat. § 8.31, subd.1.

This Court finds that Rainbow does not have a valid cause of action under the Private AG's statute. The Minnesota appellate courts have been reluctant to find additional causes of action under Minn. Stat. § 8.31 where the statute being invoked does not itself provide for a private cause of action.

See, e.g., Morris v. American Family Mutual Ins. Co., 386 N.W.2d 233 (Minn. 1986); Hommerding v. Travelers Ins. Co., No. C6-94-1843, 1995 WL 6438 *2 (Minn. App. 1995), rev. denied (Mar. 14, 1995).

Further, the Minnesota Supreme Court has held that, "the Private AG Statute applies only to those claimants who demonstrate that their cause of action benefits the public." Ly v. Nystrom, 615 N.W.2d 302, 314 (Minn. 2000). As such, "if the attorney general is not authorized to commence a proceeding because it would not result in a public benefit… then a claimant under the Private AG Statute is similarly constrained." Id. at 314; See also Pecarina v. Tokai Corp., 2002 WL 1023153, at *5 (D.Minn. 2002).

Here, Yarian correctly notes that Rainbow is aggrieving its own injury rather than protecting the public right or preserving the State's interest. In fact, Rainbow's sole request for relief is for its own alleged injuries:

> Rainbow's injuries as a result of Yarian's inappropriate actions are evident. Rainbow's damages include the costs of defending a meritless claim, including attorney's fees; the time and expense associated with Yarian's interference with Rainbow's efforts to maintain its own equipment; and Yarian's attempts to use his enforcement position with the State to question Rainbow's compliance with place-in-service reports.

(Rainbow's Mem. Opp. Summ. J., at 6).

In addition, Yarian is no longer employed by the State and therefore no benefit to the public would result from enforcing the Private AG's statute

in this situation. The Court finds that Rainbow is asserting this counterclaim for its own exclusive benefit and therefore has no cause of action under Minn. Stat. § 43A.83 pursuant to Minn. Stat. § 8.31.

## CONCLUSION

In light of the foregoing, the Court finds that genuine issues of material fact exist that preclude summary judgment in the Defendant's favor. Further, the Defendant's counterclaim fails as a matter of law.

**IT IS HEREBY ORDERED THAT:**

1.) Defendant Rainbow Food's Motion for Summary Judgment (Docket #40) is **DENIED**.

2.) Plaintiff Yarian's Motion for Summary Judgment on Defendant's Counterclaim (Docket #33) is **GRANTED**.

Date: March 14, 2003

Michael J. Davis
United States District Court